IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| SHASTA SAULEN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 11-5058-CV-SW-ODS ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## ORDER AND OPINION AFFIRMING
## COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying her application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in May 1973, has a ninth grade education, and has prior work experience as a solderer, home health aide, file clerk, account clerk, short order coook, maid, and animal caretaker. She alleges she became disabled on March 2, 2006, due to a combination of PTSD, anxiety, borderline personality disorder, asthma, and degenerative disc disease.

In addressing her medical history, Plaintiff has summarized more than 100 pages of medical records into a single paragraph and cited individual portions of the Record to substantiate the various diagnoses. Plaintiff's Brief at 3-4. Plaintiff has largely left it to the Court to pore through the medical records to ascertain what it is her doctors have actually said.

The Record establishes Plaintiff complained of back and neck pain before her alleged onset date, yet continued to work. She reported that she quit because of stress

and because her father became ill with cancer – she did not stop working due to back and neck pain. R. at 162, 357. In October 2006 Plaintiff saw Dr. Tyson Burden and reported that she suffered from degenerative disk disease at C4-C7. The most recent such diagnosis the Court could find predates Plaintiff's alleged onset date by nearly two years.[1] Regardless, Dr. Burden accepted this declaration as true and, even though Plaintiff was not taking any medication for this condition, prescribed Lorcet (a form of hydrocodone) and Flexeril (a muscle relaxer), had Plaintiff complete a "drug contract," and made arrangements for an MRI. R. at 215-16. Plaintiff saw Dr. Burden monthly until July 2007; on each occasion, Plaintiff's medication were refilled. None of Dr. Burden's reports contain any clinical findings or test results. It does not appear that an MRI was performed during this time-frame. R. at 206-14.

      In August 2007, Plaintiff went to Dr. John Freitas and told him she had stopped seeing Dr. Burden because she lived too far from his office. Dr. Freitas' treatment included prescriptions for hydrocodone, e.g., 223, 225, but Plaintiff returned to Dr. Burden in February 2008. Dr. Burden wrote that Plaintiff had "been in pain management since July [but] [h]er pain management has recently been discontinued and she needs to go back on to some form of pain management before she has withdrawals." Dr. Burden prescribed Soma and Lorcet. R. at 205. However, contrary to Plaintiff's statement, she had received narcotic pain medication from Dr. Freitas that same month. R. at 217. Regardless, Dr. Burden resumed seeing Plaintiff monthly; on each occasion he refilled Plaintiff's medications, and his treatment notes continued to be devoid of any diagnostic findings. R. at 281-83.

---

[1]The Court's review uncovered an MRI performed in November 2004, which was compared to a prior MRI from 2003. The 2004 report indicates "decreased disc height and signal intensity within the C5-C6 and C6-C7 intervertebral discs consistent with disc dehydration and degeneration." It also indicates a disc bulge at C5-6 that "does not significantly efface the thecal sac" and another bulge at C6-7 that "does not appear to extend laterally" into the thecal sac. The results were described as "similar" to those revealed on the 2003 MRI, indicating no changes over the past seventeen months. It is not clear whether Dr. Burden had access to or saw this report.

An MRI was finally performed in July 2008. At C5-6 there was "minimal disc bulging" with "minimal" narrowing of the central canal. At C6-7 there was "minimal narrowing of the proximal left osseous foramen" with no narrowing of the central canal. R. at 248, 279. Thereafter, Dr. Burden continued Plaintiff's prescriptions through at least January 2010. R. at 253-54, 257-62, 265-70, 276-78, 362-67. In September 2009, an MRI of Plaintiff's hip revealed degenerative changes at L5-S1 "suggesting possible Bartolotti's syndrome . . . with partial sacralization." R. at 256. However, "[vertebral body height and alignment is Preserved. Disc spaces are largely preserved. Parabertebral soft tissue shadow within normal limits." R. at 243. It does not appear that this MRI altered Dr. Burden's treatment, nor was this issue ever specifically addressed in his notes.

During this time period, Plaintiff also complained to Dr. Burden that she was suffering from anxiety. Dr. Burden prescribed Xanax. Beyond occasionally noting Plaintiff appeared anxious and that Plaintiff's anxiety was "stable," there are no treatment notes or other observations in Dr. Burden's records related to this condition. In April 2008, Plaintiff was referred to a psychologist (Dr. Jennifer Alberty) for a consultative evaluation. She assessed Plaintiff as suffering from PTSD, panic disorder, borderline personality disorder, and assessed her GAF score at 40. R. at 355-59. In December 2009, Dr. Alberty completed a Medical Source Statement - Mental ("MSS") indicating Plaintiff was markedly limited in her ability to perform activities within a schedule, maintain regular attendance, complete a workday without interruption from psychological symptoms, or accept instructions and criticism from supervisors. She also indicated Plaintiff was moderately limited in a variety of areas, including her ability to understand, remember and carry out detailed instructions, maintain attention, work in coordination with or proximity to others, make simple work-related decisions, and get along with co-workers. The narrative portion of the MSS indicates Plaintiff had attended "individual therapy for approximately sixteen months" and demonstrated difficulty in relationships with family members and that indicated that physical issues had exacerbated her anxiety." She indicated Plaintiff suffered from PTSD, borderline personality disorder, and had a GAF of 50. Dr. Alberty also noted Plaintiff had missed

3

half of her sessions, "limiting progress." R. at 285-87. There are no treatment notes or other records from Plaintiff's therapy sessions.

During the hearing Plaintiff was asked why she became disabled in March 2006; her answer addresses a lot of reasons, not all of which have anything to do with her medical or mental/emotional condition. She first indicated she was concerned about her father's medical situation, and the possibility that she might one day end up like him. R. at 34. Plaintiff's aunt advised that she might qualify for benefits (even though she was working at the time), so she thought "that I needed to try and see if I could qualify." She also indicated that her pain caused anxiety, and the resulting anxiety exacerbated her pain. R. at 35. Plaintiff reported becoming nervous easily at the slightest stress. R. at 35-36. She also discussed rather extensive limitations in her neck and pain in her hip. R. at 36-39.

The ALJ determined Plaintiff's testimony about her physical limitations was not fully credible because it was inconsistent with her daily activities, she did not quit her last job because she was unable to work, the fact that she was able to work for a number of years with her conditions (which had not worsened over time), the absence of medical support for the severity of her condition, and evidence indicating Plaintiff sought narcotic medication because she was addicted and not because she was in pain. R. at 17-20. With respect to Plaintiff's psychological limitations, the ALJ noted the gap in time between Dr. Alberty's initial evaluation and the MSS, the absence of any treatment notes, Plaintiff's failure to attend half of her appointments (coupled with Dr. Alberty's indication that Plaintiff's condition could be improved with treatment), and inconsistencies between the alleged severity of Plaintiff's condition and her daily activities. The ALJ nonetheless accorded some weight to Dr. Alberty's assessment. R. at 20-21. The ALJ ultimately held Plaintiff's credibly could not lift more than twenty pounds occasionally or ten pounds frequently, should not stand or walk more than two hours per day, and needed to be restricted to simple unskilled work. He also found Plaintiff "would do best in jobs that do not require contact with the general public." R. at 21. Based on testimony from a vocational expert ("VE"), Plaintiff "could not perform [her] past work because these jobs exceed the residual functional capacity in either

4

standing or lifting criteria or in level of skill required." R. at 21. However, based on the VE's testimony, the ALJ determined Plaintiff could perform sedentary unskilled work such as a wire wrapper, document preparer, bonder, or sealer. R. at 22.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A. The VE's Testimony

Plaintiff first argues the VE's testimony was wrong because it conflicted with job descriptions in the Dictionary of Occupational Titles ("DOT"). The ALJ's hypothetical question included a limitation to "only occasional use of the upper extremities for bilateral overhead reaching." R. at 52. Plaintiff contends the DOT indicates the sealer, document preparer and wire wrapper positions require "reaching," so the VE's identification of those positions is erroneous. There are at least two problems with this argument. First, the DOT contains general descriptions and is not a definitive authority on job requirements. E.g., Moore v. Astrue, 623 F.3d 599, 604-05 (8th Cir. 2010). Second, and more importantly, there is no conflict between the DOT and the VE's

5

testimony. Plaintiff presumes that the general requirement of reaching necessarily includes overhead reaching but this is wrong. "Reaching overhead" is a subset of the larger category of "reaching," and it is not correct to say that all jobs requiring the ability to reach necessarily require the ability to reach overhead. The fact that the VE did not identify any inconsistencies between her testimony and the DOT listings further demonstrates that no inconsistencies exist. A VE is expected to rely on his or her expertise provide further clarification and testimony tailored to the facts of the particular case – something the DOT cannot do. The cases addressing conflicts between the DOT and the expert's testimony are inapplicable because there are no conflicts.[2]

### B. Factual Findings and Hypothetical Questions

Plaintiff's remaining arguments are related: in the combination of arguments she contests the adequacy of the hypothetical questions posed to the ALJ because they were based in improper findings regarding Plaintiff's residual functional capacity ("RFC"). The critical issue is not whether Plaintiff experiences pain, or whether she suffers from anxiety, but rather the degree of pain that she experiences and the effects of that anxiety. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

---

[2] In light of this holding regarding the sealer, document preparer and wire wrapper positions, there is no need to address Plaintiff's argument regarding the bonder position.

6

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The Court accepts Plaintiff's argument that her subjective complaints cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. However, Plaintiff's testimony is also contradicted by evidence in the record, much of which has been alluded to earlier, including:

- Plaintiff's condition seems to have been constant over time, yet she was able to work for many years;
- Plaintiff quit her last job for reasons unrelated to her physical or mental condition;
- the absence of objective medical data to support the severity of pain she alleged;
- the absence of any indication in her treating physician's (Dr. Burden's) reports suggesting Plaintiff functional capacity was limited;
- Plaintiff's apparent drug-seeking behavior;
- Plaintiff's failure to attend therapy sessions, coupled with Dr. Alberty's assessment that Plaintiff's condition could be improved;
- the absence of any records from Plaintiff's mental health therapy sessions;
- the inconsistencies between Plaintiff's testimony and her daily activities.

7

All of these factors were legitimately considered by the ALJ, and as the finder of fact he was entitled to draw adverse conclusions from them.

Plaintiff also faults the ALJ for not deferring to Dr. Alberty's MSS. Generally speaking, a treating physician's opinion is entitled to deference; here, it is not even certain that Dr. Alberty is a treating physician. There are inferences in the Record suggesting she was involved in Plaintiff's therapy, but that is all. Moreover, the general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) – and, as stated earlier, there are no treatment records from Dr. Alberty. All that appears is her initial evaluation and the MSS, which are separated temporally by approximately eighteen months.

Plaintiff seems to suggest the ALJ should have deferred to Dr. Alberty simply because she personally saw Plaintiff. This is not a correct statement of law, and accepting this proposition would require more deference for a consultant than is justified. Plaintiff also faults the ALJ for believing only parts of what Dr. Alberty stated and accuses the ALJ of tailoring his findings in an intellectually dishonest manner "so to arrive at the end conclusion of improperly denying Plaintiff's claim." Plaintiff's Brief at 17. There is no legal requirement that a finder of fact believe everything he is told. To the contrary, juries are specifically instructed they can believe all of what a witness says, none of it, or only part of it. The ALJ's findings must have substantial support in the Record as a whole, but the ALJ is not obligated to believe everything – the question on review is whether there is substantial evidence to support the ALJ's findings. As to Plaintiff's unfounded accusation which appears to target the ALJ's integrity, the Court does not believe any discussion is justified.

Finally, Plaintiff faults the ALJ's determination of her RFC, contending (essentially) that there must be medical evidence to support every aspect of the determination. Plaintiff's characterization is not complete: while "a claimant's RFC is a medical question, . . . in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir.

8

2007). It is simply not true that the RFC can be proved *only* with medical evidence. Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam). Evidence of Plaintiff's actual daily activities and the medical evidence that existed was sufficient to support the ALJ's determination about Plaintiff's capabilities. Plaintiff's additional argument that the ALJ was required to elicit additional evidence is also rejected: there were no inadequacies in the Record. There was a paucity of *favorable* evidence, but this does not necessitate development of the Record. A consultative examination was not required.

Ultimately, it must be remembered that this is not a de novo consideration of the Record. The Court's role is to determine whether substantial evidence in the Record as a whole supports the Commissioner's final decision. The Court concludes there is substantial evidence supporting the denial of Plaintiff's claim.

### III. CONCLUSION

The Commissioner's final decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: May 7, 2012      UNITED STATES DISTRICT COURT

9